United States Courts
Southern District of Texas
F I L E D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

JUL 1 7 2024

Nathan Ochsner, Clerk of Court

| | | |
|---|---|---|
| **TRACY BRIAN BROWN** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **FRED REYNOLDS,** | § | |
| **DONALD L. DEBLANC,** | § | **Jury Demand** |
| **FLOYD WINKLER,** | § | |
| **JOHN DOE,** | § | |
| **JOE KING,** | § | |
| **KEN PAXTON,** | § | |
| **KIM OGG,** | § | |
| **CITY OF HOUSTON, TEXAS,** | § | |
| **HARRIS COUNTY, TEXAS,** | § | |
| **COURT OF CRIMINAL APPEALS, AND** | § | |
| **SECTION 552 OF THE GOV'T CODE,** | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, Tracy Brian Brown, files this Complaint against Defendants Fred Reynolds, Donald Lynn DeBlanc, Floyd Winkler, John Doe, Assistant District Attorney Joe King, Attorney General Ken Paxton, Harris County District Attorney Kim Ogg, the City of Houston, Texas, Harris County, Texas, the Court of Criminal Appeals, and section 552 of the Gov't Code (Collectively, "Defendants"), and states as follows:

### INTRODUCTION

1.      Mr. Brown is a victim of an egregious miscarriage of justice that resulted in an innocent man spending 32 years of his life in the custody of the State of Texas for a crime he did not commit. His conviction was the result of woeful misconduct by the

1

Defendants. Evidence was fabricated, governmental documents were tampered with, perjurious testimony was intentionally presented by a DA who knew the evidence was fabricated and without probable cause, and a court-appointed attorney who acted more like an adversary than an advocate, by concedind guilt in the closing argument stage of trial, even though there had been a mistrial prior to his appointment, with two defense witnesses who testified that the accused had nothing to do with the crime charged.

2.      And the misconduct didn't stop there. After conviction, the Defendants would erroneously deny Brown the postconviction process for over 27 years, and along the way, would maliciously and knowingly deny Brown access to exculpatory evidence in their possession that could prove his innocence and lead to his freedom from State custody. An unfortunate and unconstitutional theme of winning at all costs which led to Brown's loss of freedom for so many years.

3.      It all started on November 8, 1990, when Defendant John Doe falsely detained and arrested Brown, in the vicinity of the J. Thomas Lounge located at 1224 Leeland St., Houston, Texas 77002. Defendant John Doe did not have a warrant, nor did he have probable cause for stopping and placing Brown in custody and has never been made to explain what information he received and or relied upon, that directed him to place Brown under arrest without a warrant. There was a hearing on a motion to suppress and two trials in the criminal case below, however Defendant John Doe has never appeared to testify at any of these proceedings, nor has he ever been identified at any of said proceedings. *Exhibits C, D, and F.* And from all of the proceedings, and examination of the record in this case, no one knows who this officer is. See *Exhibits C and U.*

4.      In addition to probable cause not being established, the State's main witness, Defendant Donald Lynn DeBlanc, now deceased, would engage in a conspiracy to maliciously

2

prosecute Brown, by engaging in perjury claiming that Brown participated in the delivery of a controlled substance. *Exhibits C, D and F.* Testimony, that was diametrically opposite to that provided by the two Defense witnesses who not only testified that Brown did not participate in the drug transaction, and was not present when it occurred, but also testified that Brown never entered the location where the drug transaction took place. Both individuals would admit to their participation in the transaction and testify that Defendant DeBlanc entered the lounge by himself and made the drug purchase and left by himself. *Exhibits D and F.*

5.      Defendant DeBlanc, also conspired with other HPD officers to maliciously prosecute Brown by fabricating evidence and committing Perjury by providing false testimony regarding using a body microphone[1] ("body-mike") and then providing inconsistent testimony regarding using said equipment, in violation of state and federal law. *Exhibits D and F.* For instance, at both the motion to suppress hearing and the first trial, DeBlanc would testify that he wore a body-mike[2] and that the "Raid Team" was monitoring the device in case he ran into any trouble during the drug transaction. *Exhibit C and D.* At the second trial however—after the first resulted in a mistrial, Defendant DeBlanc would do a 180-degree turn, and testify that Defendant Winkler was monitoring the body-mike that he wore, instead of the Raid Team. *Exhibit F.* This false testimony would "open the door" for the perjurious testimony of Defendant Floyd Winkler, a co-conspirator in the case. *Exhibit F.*

6.      Defendant Floyd Winkler, who was the supervising officer who put the team together, and who did not testify at the first trial, engaged in a conspiracy to maliciously prosecute Brown by tampering with government documents, the offense report (Exhibit U), fabricate

---

[1] An electronic monitoring device that intercepts oral communication that allow others to listen to any conversations that may take place.

evidence and perjure himself testifying at the second trial that he heard the whole transaction inside the lounge through the body-mike that DeBlanc wore, and watched Brown and DeBlanc conduct another transaction outside the lounge. *Id.* This defendant who had no contact with Brown in any capacity, would write the police report where he omitted the name of the arresting officer, and on other governmental documents listed himself as the arresting officer (Compare Exhibits T and U), even though he testified at trial that he "witnessed" Brown being arrested. *Exhibit F, P. 96.*

7.      Defendant Joe king, the Assistant District Attorney throughout the entire prosecution of the case, maliciously prosecuted this case, and also conspired with HPD Officers and Brown's court-appointed defense attorney, to do so.  There is undisputable evidence that directly shows that Defendant King knew that the arrest was without probable cause (Exhibit C, P. 20) and was also aware that officer DeBlanc had fabricated evidence and was committing perjury in his testimony against Brown.  Defendant King would also put forth the false and perjurious testimony of Officer Winkler, knowing that said testimony was a complete fabrication and that there was no proper foundation or legal basis for said testimony.  And knew that Winkler had tampered with government documents in this case. Specifically, Defendant King knew that there was no body-mike used in the alleged transaction, and therefore Defendant Winkler did not hear the alleged transaction inside or outside the lounge.  King was aware that the testimony of Winkler was fraudulent before putting him on the stand.  And King knew that Winkler tampered with government documents, i.e. the offense report in the criminal case. *Exhibit U.*

8.      Possibly the most egregious conduct in this case would come from Defendant Fred Reynolds, Brown's third court-appointed attorney.  Although tasked with the job of representing Brown, Defendant Reynolds would engage in a conspiracy to maliciously prosecute Brown. Defendant Reynolds would intentionally and knowingly take steps to dismantle Brown's defense,

**4**

by failing to secure the testimony of one witness at trial, and in the closing argument stage of the trial, malign the other witness and completely nullify their testimony. And even though the record definitively shows Defendant Reynolds admitting that Brown never confessed to participating in the delivery (Exhibit E, P. 37), Defendant Reynolds, without informing Brown of his intentions, conceded Brown's guilt in the closing argument stage of trial totally ensuring the conviction of Plaintiff Brown. *Exhibit G*. This Defendant would also further the conspiracy by allowing the State to introduce an extraneous offense, although being clearly warned of the State's intent to submit said information, as well as fail to pursue obvious defensive evidence in the case.

9.     The Defendants would also deny Brown due process of law with respect to the postconviction process in his case. The Texas Court of Criminal would do so by denying Brown's writ of habeas Corpus, before his conviction was final in violation of Rule 11.07 of the Texas Code or Criminal Procedure. See *Exhibits M and N*. The Court of Criminal Appeals acted intentionally and knowingly to deny Brown the postconviction process, because Brown brought the error directly to the court's attention by way of a motion to dismiss which was granted by the trial court. Exhibit J. More evidence showing the Court's intent was the fact that the mandate had not issued and Brown had his PDR pending in the court at the same time. *Exhibits J and N*. This defendant would deny Brown the postconviction process for over 27 years. Exhibit O.

10.     Defendant City of Houston, through acts and or omissions of the Houston Police Department, and the Office of the Attorney General of Texas, Ken Paxton, would deny brown access to records, exculpatory information, that Brown requested under the Open Records Act to use in seeking postconviction relief pursuant to sections 11.07(4)(a)(1) and (2), of the Code of Criminal Procedure.     Specifically, Brown was attempting to get copies of his arrest report and other documents from the Houston Police Department that would support his "actual innocence"

claims, which was the only other avenue opened to Mr. Brown after the Court of Criminal Appeals erroneously denied his first writ. The Defendants would violate Brown's right to due process and equal protection of the laws by intentionally and knowingly misusing the Government Code, sections 552.028 and 552.108(a), to deny Brown documents he needed. Alternatively, if the statue was used correctly, then said statute(s) is unconstitutional.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction under 28 U.S.C. § 1331 and 1343(a)(3) and (4) because Plaintiff's suit arises under 42 U.S.C. §§ 1983, 1985 and 1988, and supplemental jurisdiction under 28 U.S.C. §1267(a), to hear Plaintiff's state law claims, if any.

12.     Venue is proper in the Southern District of Texas under 28 U.S.C. §1391(b) because that is the judicial district in which the claims arose and in which defendants resided or conducted business during the relevant period herein.

## PARTIES

13.     Plaintiff, Tracy Brown is an individual who resides in Harris County, Texas and may be contacted at 3814 Pebble Garden Lane, Katy, Texas 77449. At this time, Brown is proceeding Pro Se.

14.     Defendant Fred Earl Reynolds, Jr., was employed by the Harris County Public Defenders Office at the time made the basis of this suit. He is sued in his individual and official capacities. He can be served with process at 4043 Fernwood Drive, Houston, Texas 77021-1523

15.     Defendant Donald Lynn DeBlanc, deceased, was employed by the City of Houston as a police officer in the Houston Police Department at the time made the basis of this suit. He is sued in his individual and official capacities. His estate can be served with process through the Houston Police Department, located at 1200 Travis St., Houston, Texas 77002

16.     Defendant Winkler was employed by the City of Houston as a police officer in the Houston Police Department at the time made the basis of this suit.  He is sued in his individual and official capacities.  He can be served with process through the Houston Police Department, located at 1200 Travis St., Houston, Texas 77002.

17.     Defendant John Doe was employed by the City of Houston as a police officer in the Houston Police Department at the time made the basis of this suit.  He is sued in his individual and official capacities.  He can be served with process through the Houston Police Department, located at 1200 Travis St., Houston, Texas 77002.

18.     Defendant Joe King, was employed by Harris County as an Assistant District Attorney at the time made the basis of this suit.  He specifically prosecuted the case in all proceedings in the district court.  He is sued in his individual and official capacities.  He can be served with process at his place of residence 14027 Memorial Drive, Apt. 387, Houston, Texas 77079.

19.     Defendant Kim Ogg is currently District Attorney for Harris County and is sued in her official capacity as the successor-in-office and successor-in-liability to Mike Driscoll, the Harris County District Attorney at the time Mr. Brown was wrongfully convicted.  Defendant Ogg may be served with process at her usual place of business by delivering a copy of the summons and of the complaint to the Harris County District Attorney's Office, 1201 Franklin St., Suite 600, Houston, TX 77002-1923.

20.     Defendant Ken Paxton, is currently the Attorney General of Texas, and is sued in his official capacity as the successor-in-office and successor-in-liability to the former Attorney General of Texas Dan Morales.  Hey may be served with process at the Price Daniel Sr Bldg., 8th floor,  at 209 W. 14th street, Austin, Texas 78701.

21. Defendant City of Houston is a municipal corporation located in Harris County, Texas, and in this judicial district in the State of Texas. The City of Houston is sued for the constitutional violations carried out by its Police Department in pursuit of Mr. Brown's wrongful conviction and incarceration. Defendant City of Houston may be served with process by delivering a copy of the summons and of the complaint to Mayor John Whitmire, Attn: Patricia Daniels, City Secretary, City Hall Annex, City of Houston, 900 Bagby St., Houston, TX 77002, as authorized by State law.

22. Defendant Harris County, is a governmental organization organized under the laws of the State of Texas. Harris County is sued for the constitutional harm suffered by Mr. Brown as a result of the County's official and unofficial policies and customs, including but not limited to: failing to adequately train and supervise District Attorneys with respect to their constitutional obligations to disclose exculpatory material and impeachment evidence; pushing prosecutions to convict criminal defendants regardless of the weight of the evidence against them; fostering widespread disregard for the constitutional rights of the accused; permitting District Attorneys to employ unlawful tactics, such as intimidations and bribery, to secure favorable witness testimony; and general inadequate management and administration of the District Attorney's Office.

23. Defendant Harris County is also sued for the constitutional harm suffered by Mr. Brown as a result of the County's official and unofficial policies and customs, including but not limited to: failing to adequately train and supervise Public Defenders with respect to their constitutional obligations to be an advocate for their clients; to meet and confer with the client in a timely manner; to discuss options and trial strategy; and secure any and all witnesses before a proceeding. Defendant Harris County may be served with process by delivering a copy of the

8

summons and of the complaint to the Harris county Judge, Honorable Lina Hildago, at 1001 Preston, Suite 911, Houston, TX 77002, as authorized by State law.

24.     Defendant Court of Criminal Appeals is sued in its official capacity and can be served at 201 W 14th St, Austin, TX 78701.

## PROCEDURAL HISTORY

25.     Mr. Brown was convicted of delivery of a controlled substance on September 2, 1992, in the 339th District Court of Harris County, Texas and was sentenced to 35 years TDCJ-ID.

26.     On December 2, 2021 the Honorable Tevia Bell, Presiding Judge, 339th District Court, signed the Order approving of Applicant's Proposed Findings of Fact and Conclusions of Law. In said Order, the Court held that Defendant Reynolds provided ineffective assistance of counsel in violation of Mr. Brown's constitutional rights. *See Exhibit W.*

27.     On June 16, 2022, the Texas Court of Criminal Appeals set aside the Judgment of the 339th District Court, remanding the case to the trial court for a new trial and other proceedings consistent with the Opinion.

28.     On July 29, 2022, the 339th District Court of Harris County, Texas, granted the State's Motion to Dismiss the case against Mr. Brown, and he was released from custody that day.

## FACTS IN SUPPORT

### A. Brown is Arrested Without Probable Cause by Defendant John Doe

29.     On November 8, 1990 Defendant John Doe, a Houston Police Officer, Stopped and detained Brown in the vicinity of the J. Thomas Lounge at 1224 Leeland Street, Houston, Texas 77002. Plaintiff Brown was not informed as to why he was being detained, and after the elapse of a couple of minutes, was placed under arrest and placed in a patrol car. Mr. Brown was not read

his rights, and was not informed of the charges until arraigned. Mr. Brown was not transported with any other person arrested that day.

30. On November 12, 1990, the 339th Judicial District Court of Harris County, Texas appointed Mr. Frank Sheppard, Jr., to represent Brown in cause number 580614, for Delivery of a Controlled Substance. Immediately after appointment, Mr. Sheppard would file several motions including a Motion for Discovery, and Motion to Suppress the Evidence. *See Exhibits A and B.* On July 9, 1991, the trial Court, would grant the motion discovery. *Exhibit A.*

## B. The State Failed to Present the Testimony of the Arresting Officer at Hearing on Motion to Suppress, and Does Not Know Who That Officer Is

31. On October 16, 1991, a hearing was held on the motion to suppress. *Exhibit C.* Defendant Joe King, representing the state that day, would present the sole testimony of Defendant DeBlanc, the Undercover Police Officer for the Narcotics Division for that day. Defendant DeBlanc testified that on November 8, 1990, he was contacted by Defendant Floyd Winkler of the Special Operations Division Tactical Unit, regarding a complaint of drug trafficking at the J. Thomas Lounge. DeBlanc testified that Winkler wanted him to work in an undercover capacity, along with himself, and several other officers—L. Good, J. Lopez, and L. Gonzalez—to investigate the trafficking complaints directed at the lounge. *Exhibit C, P.5.* DeBlanc further stated that his role, and or purpose for going to the lounge, was to attempt to "purchase cocaine from a street-level dealer," selling there. *Exhibit C, P. 5.* DeBlanc also testified that they had no warrants that day, neither an arrest warrant or a search warrant. DeBlanc would also testify that no specific name was "conveyed to him" as the target of the operation. *Exhibit C. P 7.*

32. DeBlanc also testified that when they went out to the location, that Winkler dropped him off south of the location, and he walked to the front of the lounge; that it was rainy that day; and that there were several people standing about as he reached the front of the lounge. *Id. 8-9.*

When asked did he see Winkler once he reached Leeland Street, DeBlanc would admit that he saw the car parked across the street and toward the corner, but that he could not tell whether Winkler was sitting in the car or not.

33.   DeBlanc further testified that as he walked closer to the entrance of the lounge, that Brown observed him approaching, and stepped toward DeBlanc asking him "what he was doing," to which he responded "he was looking for Charles, and trying to get one of those twenty-dollar rocks." *Exhibit C, P. 10.* DeBlanc claims that Brown stated, "you mean Russell," and led him into the lounge where they were both met by Barbara Williams and Russell Thomas just inside the door of the lounge. *Exhibit C, P. 10.*

34.   Once inside, DeBlanc testified that he went through a screening-type process where Barbara Williams asked, he if he was the "law", and after answering in the negative, Russell Thomas then handed him the rock of cocaine, for which he gave Thomas a marked $20 bill. After the transaction took place, DeBlanc testified that he and Brown exited the lounge, and after reaching the front, Brown then began asking him for a "bump" of the dope[3], for which he said no. DeBlanc further stated that Brown offered to sell a crack pipe, which he agreed to purchase for $3. After the transaction, DeBlanc stated he walked back south of the lounge and began giving descriptions of the suspect to the raid team who were monitoring the body mike that he wore. *Exhibit C, P. 11 – 15.*

35.   DeBlanc also testified that Winkler then picked him up as he approached the block south of the lounge, and after getting into the vehicle with Winkler, that he and Winkler eventually drove around to the front of the lounge where he identified the people who were involved with the transaction. Although DeBlanc testified that he interacted with Brown, Barbara Williams and

---

[3] A small portion or piece of the cocaine purchased

11

Russell Thomas, a total of three individuals, four people were actually arrested that day.   Mr.

Thomas Ervin, was also arrested in connection to the alleged drug transaction. *Exhibit C, P. 16.*

36.      After bringing the examination of officer DeBlanc to an end, Mr. Sheppard would

conclude the hearing making the following observation and statement to the court:

> "**All I can say is that first of all, the arresting Officer is not even here.
> We don't know who that is. No one even knows who that was.** I think that it is
> important to determine as to what was the effect of the transaction, that went on
> inside. Did he have anything on him when he was arrested? Did he have any money
> on him when he was arrested? Did he have anything to do with this case? **It's a
> little hard to determine that, without the arresting officer being here to testify**

*See Exhibit C, P. 20.*

37.      The state did not respond directly to Mr. Sheppard's closing statement

regarding not knowing who the arresting officer is.  The arresting Officer never appeared at

the hearing, nor did  the State establish whether it knew the officer who arrested Mr. Brown,

nor did it correct or oppose the assertion made by Mr. Sheppard. *Exhibit C.*

### C.  The Arresting Officer Does Not Testify at the First Trial and No One Knows Who He or She is.

38.      The first trial was held on October 18, 1991, before the Honorable Judge Wendell

Odom.   The State would again present the sole testimony of Defendant DeBlanc, who would

provide a great deal of the same testimony, as he did at the hearing on the motion to suppress. *See*

*Exhibit D.*  With respect to the arrest, DeBlanc would state that **after** he got in the car with Officer

Winkler, that he "basically watched the raid team move in, initiated the arrest on the individuals

he told them to." *Exhibit D, P. 30.*

39.      Mr. Sheppard would cross-examine Defendant DeBlanc and specifically zero-in

again on the arrest, the offense report and the body-mic, and the following would transpire:

> Mr. Sheppard:  And before you come to court to testify in this case, do you refresh
> your memory by reading your offense report?

DeBlanc:        Yes, sir, I do.

Mr. Sheppard:   And that offense report was prepared on or about November 8th, 1990 is that correct?

DeBlanc:        That's correct, sir.

Mr. Sheppard:   Which was done just within a few hours after this transaction and these arrests took place, is that correct?

DeBlanc:        Yes, sir.

Mr. Sheppard:   Your Honor, since he's refreshed his memory may we have an opportunity to look at the offense report?

Mr. King:       The State is tendering a copy to the defense Counsel which he has seen on several occasions.

...

Mr. Sheppard:   Officer, I believe your testimony on direct examination was that when you entered – when you approached the lounge on Leeland Street here that you had a monitoring device on?

DeBlanc:        That's correct, Counsel.

...

Mr. Sheppard:   When you go out to make a purchase like this I believe you testified you do – you wear a monitoring for safety reasons?

DeBlanc:        That's correct, sir.

Mr. Sheppard:   Where do you obtain the monitoring device from?

DeBlanc:        Each of the decentralized units as well as our division have these monitoring devices.

Mr. Sheppard:   And how do you get it into your possession?  Do you have to go ask somebody for it?

DeBlanc:        I don't understand the question.

Mr. Sheppard:   Do you have to requisition it or carry it around in your back pocket; where do you get it to make a purchase?

13

DeBlanc:         We get it from one of the individuals involved, the case agents. If I was the particular case agent I would acquire it from my supervisor.

Mr. Sheppard:   So, you go ask somebody if you can have a monitoring device, you need it for that day?

DeBlanc:         Yes, sir, that's right.

Mr. Sheppard:   You have a copy of this report, I assume, or do you?

DeBlanc:         Yes, sir, I do.

Mr. Sheppard:   would you tell us why there is no mention in this offense report that you're wearing a monitoring device on November 8th of 1990?

Mr. King:        Your Honor, I'd object to that testimony.

The Court:       Sustained.

Mr. Sheppard:   When you make offense reports do you write down what happens when you make the arrest or the purchase?

DeBlanc:         I didn't make this particular report, sir.

Mr. Sheppard:   But you reviewed it.

DeBlanc:         yes, sir, that's correct.

Mr. Sheppard:   You had input to it as to what happened here, did you not?

Mr. King:        Your Honor, this is improper impeachment of this officer.

Court:           Overruled.

Mr. Sheppard:   You had input into making of the offense report, did you not?

DeBlanc:         When you say input, sir, could you be more specific.

Mr. Sheppard:   You had to tell somebody what happened since you were the only one that went in there. You told somebody to write this down because this is what happened

DeBlanc:         Yes, sir, I conveyed to the case agent what transpired and he initiates a police report.

14

Mr. Sheppard:  All these seminars and law enforcement agencies, don't they tell you to write down the details and put them in the offense report so that the DA and everybody involved in the case would be able to find out what happened out there?

Mr. King:  Again, your Honor, this is improper impeachment.

The Court:  Sustained.

Mr. Sheppard:  Who prepared this offense Report?

DeBlanc:  I conveyed the information to officer Winkler – give me a second here.  Yeah, he initiated the police report, sir.

Mr. Sheppard:  How many people were arrested on November 8th of 1990 at the J. Thomas Lounge?

DeBlanc:  I didn't participate in the arrest, sir.

Mr. Sheppard:  Are you telling me you don't know who was arrested in this case?

DeBlanc:  I'm simply telling you I identified the individuals involved in my transaction.

Mr. Sheppard:  Who are the people you testified about on direct examination?

DeBlanc:  That would be Barbara Williams.  Also Russell Thomas and your criminal defendant.

Mr. Sheppard:  And are those people arrested in this case?

DeBlanc:  Yes, sir.  They all were arrested.

Mr. Sheppard:  How about Thomas Irving, was he arrested?

DeBlanc:  Yes, sir, for a different charge.

Mr. Sheppard:  Then he was arrested on November 8th of 1990, is that correct?

DeBlanc:  Yes, sir, that's right.

Mr. Sheppard:  At the J. Thomas Lounge?

DeBlanc:  I didn't participate in the arrest, but yes, sir, for a different charge.

Mr. Sheppard: You identified as you've testified to on direct examination all of the people that were arrested at the J. Thomas Lounge, is that correct?

DeBlanc: Say again, sir.

Mr. Sheppard: I believe you testified on direct examination that you identified all these people that were arrested at the J. Thomas lounge?

DeBlanc: I identified all of the individual involved in my transaction, sir.

Mr. Sheppard: So, your testimony is Thomas Irving was arrested but he wasn't involved in your transaction, correct?

DeBlanc: That's correct, Counsel.

Mr. Sheppard: Did you make the arrest of this defendant?

DeBlanc: Sir, I've already testified I didn't participate in the arrest.

Mr. Sheppard: Who made the arrest?

DeBlanc: sir, I came by the location, positively identified the individuals involved. I don't know.

Mr. Sheppard: Would you reflect and look in your report and tell me who the arresting officer was?

DeBlanc: I didn't participate in the arrest, Counsel.

Mr. Sheppard: Would you look in the report and just tell us? These people want to know who arrested and how this defendant was arrested.

DeBlanc: Yes, sir, he was arrested by the raid team.

Mr. Sheppard: By the raid team?

DeBlanc: Yes, sir.

Mr. Sheppard: Which officer arrested this defendant if you could tell us, please?

DeBlanc: I don't know, sir. I didn't participate in the arrest.

See Exhibit D, Pp. 38 – 45.

16

40.      ` Following the testimony of Defendant DeBlanc, the state would present no

other witnesses. The State would especially fail to present the testimony of the arresting officer.

## D. The Defense Witnesses Testify that Brown Was Not Present When the Transaction Took Place, and Had Nothing to Do with it, Resulting in a Mistrial

41. The Defense would first present the testimony of Russell Thomas, who testified

that Defendant DeBlanc entered the lounge by himself and asked for a "twenty[4]" *Exhibit D, P. 74.*

Thomas stated that he recognized DeBlanc, because he came around before. *Id.* Thomas also

stated that he told Barbara Williams, who was standing by the door, that he knew him in response

to Williams' statement that she never seen him before. Thomas stated that there was a quick back-

and-forth between Williams and DeBlanc, and that he simply handed DeBlanc a \$20 rock, for

which DeBlanc handed him a \$20 bill, and then left. Thomas was asked if he had seen Brown that

day, and Thomas testified that Brown was not inside the lounge at the time, and had to have been

outside. *Exhibit D, P. 76.* Thomas further testified that he saw Brown earlier outside, and that

when the police entered the lounge to make arrests, that three officers entered the lounge, and that

he, Barbara Williams, and Thomas Ervin were arrested together that day inside; that he did not see

Brown arrested that day; and that Brown was not transported with them after arrest. *Exhibit D, P.*

*78.*

42. The Defense then put Barbara Williams on the stand who testified that DeBlanc

entered the lounge by himself, and that she made a comment that "he didn't look like he smoked,"

to DeBlanc after he had asked Thomas for a \$20 rock. *Exhibit D, P. 90.* She also stated that she

told DeBlanc that "he looked like the law[5]," for which DeBlanc only smiled. Williams further

stated that Russell then handed DeBlanc the cocaine, and DeBlanc handed Thomas the money and

---

[4] \$20 rock of cocaine.

[5] A way of saying that he looked like the police.

17

then left the lounge.  Williams  also testified that Brown never came into the lounge, and she was

sure of it.  *Exhibit D, P. 99.*

43.     After both sides rested their case, the case was given to the jury to deliberate, and

after not being able to reach a unanimous decision, a mistrial was declared.  See Exhibit D.

### E.  Defendant Reynolds Submits a Verbal Motion to Stay the Second Trial Because of the importance of the Testimony of the Defense Witnesses

44.     On September 2, 1992, the trial court held a brief pretrial hearing before the second

trial, based on the verbal motion to stay submitted by Defendant Reynolds.  At the hearing,

Reynolds would state the following urging delay of the trial:

> "Judge, Tracy Brown by and through his attorney of record – Fred Reynold—that
> is, his third attorney of record, Fred Reynolds, would move to put the case off for
> enough time, just enough time for him to make sure that he has two witnesses that
> he has subpoenaed who are material witnesses to the case, who were present when
> the case took place, or when the issues involving the case took place.  And both
> people are in the city of Houston.  One is on probation out of the 339th District
> Court for this offense.
>
> …
>
> I think that it puts Mr. Brown at a disadvantage, inasmuch as he has been in the
> continuous custody of the State for the last 21 months, not to have these witnesses
> to go to trial – strike that.  It puts him at a disadvantage not having the parties who
> were present when the offense occurred, who would testify in his behalf; and I thnk
> it would deprive him of a fair and impartial trial.

*Exhibit E , P. 5- 6.*

### F.  Defendant Reynolds Admits that Brown Never Admitted Guilt and Wanted Him to Focus on the Arrest

45.     At that same hearing Mr. Reynolds would also decide to question Mr.

Brown before the Court, about the arrest and whether Brown ever confessed to the crime.

The following would take place:

> Mr. Reynolds:    Judge, may I inquire of Mr. Brown a few questions?

18

The Court:       Yes, Sir.

Mr. Reynolds:   I did have a chance to talk to you about this case for two and a half
                hours in the holdover cell and we talked at length about this and I
                also got you, and gave to you, a copy of the transcript, didn't I?

The Defendant: Yes, sir.

Mr. Reynolds:   And we talked about the legal issue regarding the search and your
                arrest.  And you were not arrested with any contraband on you,
                were you?

The Defendant: No.

Mr. Reynolds:   Nor have you confessed to anything?

The Defendant: Nor was I arrested with anything.

Mr. Reynolds:   So I explained to you at that point, there being no issue involving
                any suppressionable issues involving your arrest, that they
                wouldn't suppress the arrest and there was no contraband or a
                confession to suppress from any illegal arrest.

*Exhibit E, Pp. 37-38.*

## G. Defendants DeBlanc and Winkler Both Fabricate Evidence and Commit Perjury at the Second Trial.

46.     At the second trial, the State would again present the testimony of Officer DeBlanc.
When it came to the arrest of Mr. Brown, DeBlanc would adamantly state that "he did not
participate in the arrest," *Exhibit F, P. 60, L. 5*.  DeBlanc would then provide inconsistent testimony
when it came to several details of the investigation. This time when asked if there was a person of
interest, DeBlanc would say that he had a name, Barbara, when at the first trial he said a name was
not given. See\ *Exhibits C and D and F.*  When it came to describing the details surrounding the
body-mike, now DeBlanc would claim that "he was not sure who had the monitoring device,"
claiming that it could've been Winkler, or one of the officers on the Raid Team. *Exhibit F, P. 70.*

With this inconsistent statement, the door would now be open for the State, Defendant Joe King, to intentionally and knowingly present the fraudulent testimony of Defendant Winkler.

47.    Defendant Floyd Winkler would testify that he was the Case Agent who put everything together, calling DeBlanc to work as a UC (Under Cover) agent. *Exhibit F, P. 78.* Winkler also stated that he was monitoring the body-mike that DeBlanc wore, and that "per rules and regulations, in order for him to have made a recording of the transaction, all he would have had to do is have a blank tape, a brand-new cassette tape. *Exhibit F, Pp. 82 – 83.* Winkler testified that he did not record the transactions. *Exhibit F, P. 101.* Winkler also testified that he heard the transaction that took place in the lounge, as well as the transaction that took place outside. Winkler's version of events differed from that of DeBlanc's. Winkler claims that Brown was paid $5 for the crackpipe, when DeBlanc said $3. *Exhibit F, P. 95.* Winkler says he is the one who provided the description to the raid team, although DeBlanc claimed that he did. Winkler also testified that he is the one who wrote the offense report from DeBlanc's description of the events, and that it was just for him to refresh his memory. *Exhibit F, P. 102 – 104.*

## H. Russell Thomas testifies that Brown did not participate in the drug transaction, nor was arrested inside the lounge

48.    Russell Thomas would again testify that he, Barbara Williams, and Shorty (Thomas Erving) were the only ones arrested in the lounge that day, and that when the police entered the lounge, and they stayed for about 15 to 20 minutes making the arrests. *Exhibit F, Pp. 130 -132.* Thomas further testified that when they were taken out front, that he didn't see Brown out there. *Id.* Thomas also stated that it was only three officers who entered the lounge and made the arrests that day. *Id.* at 133. Thomas also testified that when he and Thomas Erving were brought out the lounge, that Barbara Williams was placed in one patrol car, and that he and Thomas Erving were put in another. *Id.* at 134. He also testified that he never saw Plaintiff Brown outside or even after

he was arrested. *Id. at 138.* Thomas again testified that DeBlanc came into the lounge by himself, and asked for a 20-dollar rock! *Id.* at 146. Thomas also testified that he did not know that Plaintiff Brown was arrested for the delivery until he came to the first trial in the case. *Exhibit F, P. 141.* Finally, Thomas testified that Shorty (Thomas Erving) worked for him. *Id.*

## I. Trial Counsel abandons Brown's defensive evidence and concedes Brown's guilt

49.     Following Russell Thomas's testimony, the Court would ask Defendant Reynolds to call his next witness.   Reynolds would call for Barbara Williams to take the stand, followed by the Judge calling her name. *Exhibit F, P. 156.* Getting no response, the Bailiff would state for the record that there "had been no response," and Defendant Reynolds would then ask the court for an attachment, for which the court would respond that an attachment had been issued the day before. *Exhibit F.* The court then sent the jury back to the jury room, informing the jury that it was waiting for a defense witness. *Id. at 157.*     Williams would fail to show-up in a timely manner, and Defendant Reynolds would then move to rest the case, without submitting the transcript testimony of Barbara Williams from the first trial.

50.     In the closing-argument stage of trial, Mr. Fred Reynolds, without giving any notice, without consulting or even asking Applicant's permission, made the following argument conceding Applicant's guilt:

> **Defense Counsel**: But be that as it may, that doesn't deal with what I deem to be the most crucial issue in this case; and that's the fact that the State has filed the wrong charge in this case. They filed the wrong case here.
>
> *You've got a situation—when you just start talking in a very basic street-type term, you've got a dope user coming to buy dope from a place where they have known pushers. And this dope user has asked the question, What do you want; and the user says, from the other user, I want a 20-dollar rock. Well, now this other dope user helps the supposed dope user get himself some dope.*

21

*Ask yourself: Did this person aid, encourage, help, and assist this other dope user to get ahold of some dope? And does that make the dope user a pusher because the one dope user takes another supposed dope user to a known admitted pusher?*

And the testimony conflicts there. The pusher says there weren't no words from the one person. The officer says yes, there was. Not only did he point at him— you know, you just have to think about this; you're going to go buy some dope and go into a place and shout across the hall, We want a 20-dollar rock. You know, that's kind of strong there.

I'm not going to—if you've got a place that's supposed to be open, a public place that's supposed to be open—if that's how they do their dope transaction, that's kind of wide open. And I would suspect people would have used a little more discretion in those types of transactions in the event you don't know if there are some undercover officers sitting in the place waiting, trying to see what's going on.

***But in this case, it's against the law to help somebody buy dope even if this person is a dope user just like you. If you aid this dope user, just like you, in getting some dope from a pusher, does that make you a pusher?*** You've got a 20-dollar rock situation involved in a case like this. And does that make you a pusher? Why didn't they file that case against him? ***It's clear that he aided, abetted, and assisted another supposed user in order to get some dope, if you believe the testimony of the officer.***

If that makes you a pusher, big-time pusher, then under our laws—I just don't see it. Does that make you a pusher? You've got people out there, they can't help themselves. Does that make them a pusher, these users, these dope heads? Does that make them a pusher? They need help.

And we certainly aren't treating things properly by dealing with these same people in a super-technical way, in a super-technical way by trying to identify him with this person that got up on the stand and testified, who in my mind is lower than, lower than—

Prosecutor: Objection to what is in defense counsel's mind as being improper argument.

Court: Sustained.

22

A person like that is—anybody that would confess that they've made money living like that is just a low person, not even a person.

But these are the parasites, the parasites that get people strung out to the point where they can't help themselves, hang their own. They can't do nothing. They can't help themselves. Does that make them a pusher?

*They filed the wrong charge here, if you believe the officer. There's no doubt that that person, the officer who was masquerading as a dope head, was assisted in his quest to buy some dope by this man. It is undisputed, if you believe the officer, that this man asked him for a piece of the dope he bought for directing him to the pusher. It's undisputed. Does that make this man a pusher?*

This man—this charge has been pending for 21 months, 21 months of punishment on something like this, 21 months of wasting the taxpayers' money on something like this. When you've got people dealing dope, pushers walking around these streets on probation, on probation. And this is the man that admitted to you that he not only made the delivery but he admitted to you how much money he was making off of it.

*They filed the wrong charge. It is just as logical that this man— and, in fact, more logical when you stop and consider the total testimony given by the officer—that this man was helping the officer.*

The prosecutor is going to get up and make an argument to you, and he has that right. There are a lot of things I may have wanted to say to you that I won't have a chance to answer. But I'd ask you if certain issues are raised by him that I would have raised or could have raised, that you answer those issues for Tracy Brown in your own mind.

But I think based on the evidence that they've produced here—you all will have to render your verdict individually, this is an individual thing; and then you collectively arrive at a unanimous verdict—you can look at it both ways; did he aid and abet a person in buying dope, did he aid and abet a person in delivering dope?

And which one would you—which one makes the most sense based on what you've heard? Does it make more sense that he was masquerading as a doper, or does it make more sense that he was helping the pusher?

The prosecutor indicated to you that people did things for a reason, that they were doing things for a reason. They expect to get something out of what they do. It is obvious by the officer's testimony and by the testimony of the pusher that his man got nothing from the pusher but he was trying to get something from the officer, the user. They filed the wrong charge.

*And the evidence should raise a reasonable doubt as to whether or not he assisted the pusher in the delivery when, in fact, he assisted the buyer into making the buy."*

*Exhibit G.*

### J.    The Prosecution thanks Defendant Reynolds for conceding Brown's guilt

51.    Following defense counsel's closing argument, Defendant King began his closing

argument by literally thanking Mr. Reynolds for conceding Applicant's guilt, and doing his job for

him, with the following:

**MR. KING:** Ladies and gentlemen, I've wrote "pusher". Down here on mine, "big-time pusher." And I want you to look very carefully anywhere in this charge to see that word or those words. Mr. Brown is not charged nor is there any evidence Mr. Brown is a pusher. That is not an element. You can put it out of your mind and ignore all of it. That's not what he's charged with. That's not what the state has to prove.

*The only thing the State had to prove in this case was that he aided in a delivery. And most certainly he aided in a delivery.*

*I thank you very much, Mr. Reynolds. He's admitted it. He's told you that.    That's his argument, that he aided in the delivery.*

*Exhibit G, Pp. 14 - 15].*

### K. Brown Firmly objects to trial counsel's concession of guilt.

52,    Sensing that Brown was not happy with Mr. Reynolds' closing argument, the trial

court gave Brown an opportunity to voice his disappointment:

24

MR. BROWN: "I'm going to make a total objection because, two, I never gave this man – in his last closing arguments – right now I've never admitted in my life as to any participation. And I'm objecting to his closing arguments right now, his representation.

He said basically to the jury that I said: Yeah, I thought I was going, trying to get some dope from him.

In representing me, said that I was guilty. I stood up here and stated that I was not guilty. I meant that. I want to stress that I totally object."

*See Exhibit G, P. 20.*

### L. The trial Court takes judicial notice that counsel failed to present the testimony of Barbara Williams

53.     In the punishment stage of trial, the Honorable Judge Keeshan, before rendering

judgment, would point out the following:

"Before I announce my judgment in the case, I would like the record to show that -- and I take judicial notice of the following fact – there was a reluctance on the part of counsel for the defense to proceed with trial this week because he wanted additional time to secure certain witnesses in the case.

Russell Thomas was, in fact, secured and did testify; and, apparently, Russell Thomas had testified earlier in the case. It was brought to my attention that there was a transcription of the testimony of witnesses at the first trial. Having testified, also Barbara Williams testified at the first trial; **and the transcription of her testimony was available in the courtroom.**

....

I would like the record to also show that had the Court been requested during the trial to give additional time to secure the presence of Barbara Williams as a witness, that the Court would have afforded additional time; that the Court several times, off the record, asked the defense whether or not they were making progress in securing the presence of Barbara Williams.

I would like it to be known also that there was some mention by the Court in the presence of counsel of the possibility of offering former testimony if the predicate was supplied indicating unavailability of the witness.

**I want the record to further show that after the testimony was completed – very shortly after the testimony was completed and perhaps during the progress of arguments in the case – that Barbara Williams was brought to the**

courtroom or came Voluntarily to the courtroom, made herself known; and, of course, the Court examined her about where she had been in the meantime. I do not think it was on the record. It's not on the record, but she was present.

Had I been requested to do so, I may have reopened the trial for purpose of presenting such testimony.

*Exhibit H*, Pp. *16-19*. After deliberations, the jury would return a verdict of guilty, and Brown was sentenced to 35 years in the Texas Department of Criminal Justice— Institutional Division.

### M. The Court of Criminal Appeals, acting without jurisdiction, denies Brown the postconviction process for 27 years

54. Brown would appeal his conviction to the First Court of Appeals, which would affirm the conviction in a published opinion on November 4, 1993. *See Brown v. State 866 S.W.2d 675* (Tex. App—Houston [1st Dist.] 1993, pet. ref.). Not sure whether his appellate attorney would file a petition for discretionary review on his behalf, Brown, in early January, 1994, would file a pro se writ of habeas corpus with the trial court, advancing the same grounds brought on appeal. *Exhibit I.* Two weeks later, Brown would receive a letter from his appellate attorney Karen Zellars[6], informing him that she intended to file a Petition for Discretionary Review in the case. The Petition for Discretionary Review was filed on January 18, 1994. *Exhibit J.* Immediately after receiving the letter, Brown would move to dismiss the writ arguing that "he prematurely filed the writ because his conviction was not final". See *Exhibit L, P. 4.*

55. The trial court would deny the writ on the merits on January 26, 1994. *Exhibit K.* The trial court would receive Brown's motion to voluntarily dismiss the writ without prejudice the next day, January 27, 1994, and the honorable Judge Ann Cosper, would grant the motion that day. *See Exhibit L, P. 9.* later that day the Harris County District Clerk submitted the clerk's record

---

[6] Karen Zellars_Bar #[ _____, now deceased, represented Mr. Brown on appeal

containing the trial court's order dismissing the writ to the Court of Criminal Appeals. *Id.* On February 15, 1994, a supplemental Writ Clerk's Summary Sheet, including Applicant's pro se motion to dismiss and the trial court's order granting Mr. Brown's motion to dismiss, was transmitted to the Court of Criminal Appeals. *Exhibit L.*

56.     On February 16, 1994, the Court or Criminal Appeals would deny Mr. Brown's *pro se* writ of habeas corpus without a written order. *Exhibit M.* Two days later, February 18, 1994, the Clerk of the Court of Criminal Appeals would receive and docket Mr. Brown's *pro se* motion to dismiss and Judge Cosper's order granting the motion to dismiss. *Exhibit L.*

57.     The Court of Criminal Appeals did not reconsider its February 16, 1994 order denying Brown's initial writ of habeas corpus, despite receiving judge Cosper's order granting Brown's motion to dismiss just two days later, as well as having Brown's petition for discretionary review currently pending before the court at that time. On April 20, 1994, the Court of Criminal Appeals would deny Mr. Brown's Petition for Discretionary Review. *Exhibit J.* On June 10, 1994 the mandate of affirmance would issue in the case. *Exhibit N.*

## M.      HPD and the Attorney General's Office work together to deny Brown exculpatory evidence in HPD's possession

58.     After the Court denied Brown's PDR and Writ of Habeas Corpus, Brown decided to go about trying to prove his innocence by contacting the Houston Police Department and making an open record requests regarding the police report and other documents in the possession of HPD, connected to the criminal case. *Exhibit P.* In said request, Brown clearly stated that he wanted documents that pertained to him, *Exhibit P.*

59.     While incarcerated, Brown submitted several of his own requests, *Exhibit P*, Mr. Brown's mother, Vivian Brown, and Kim Martinez, would also make requests for the same records, and all would be denied. *Exhibits P.* . Each time a request was made, HPD would apply to the

office of the Attorney General office of Texas, to be exempted from responding to the request. *Exhibit Q.* HPD would seek exemption pursuant to section 552.028 of the Government Code, arguing that Mr. Brown should not get said documents because he was incarcerated. *Exhibit Q.* Vivian Brown and Kim Martinez, who were not incarcerated, and who wanted said documents for their own purposes, were denied the request because it was assumed that they were acting on behalf of Brown, as an agent, and therefore not entitled by virtue of Mr. Brown's status. *Exhibits P and Q.*

60.     After Brown was released from prison in the year 2000, Brown would make several additional requests for the offense and arrest reports from Defendant HPD, and again would be denied said documents. *Exhibits P, Q and R.* This time however, Defendant HPD would deny Brown said documents by seeking exemptions from the Attorney General's Officer pursuant to section 552.108 of the Texas Gov't Code, because charges against one of Brown's codefendants ("Thomas Ervin") was dismissed. *Exhibit Q.* In 2019, the Attorney General's Office would grant said exemptions and Brown again would be denied the documents sought. *Exhibit R.* At the time that the attorney General's Office granted the exemptions to Defendant HPD pursuant to section 552.108, Thomas Ervin, the sole basis for the exemption, had been deceased 7 years prior. *Exhibit S.* Mr. Ervin died on January 12, 2012. *Id.*

## N.     Brown's Conviction is overturned and he receives an expungement of his records

61.     On January 20, 2021 Brown filed his second writ of habeas corpus in the 339th Judicial District Court of Texas, arguing actual innocence and that he was denied the effective assistance of counsel. On February 11, 2021, The trial court would subsequently appoint Bob Wicoff and Carol Camp from the Public Defenders' Office as counsel to represent the case.

62.     On February 19, 2021 Mr. Bob Wicoff would file with the Court of Criminal Appeals Applicant's Suggestion That the Court Reconsider It's Decision Denying the Applicant's First Application for a Writ Of Habeas Corpus, gently pointing out to the Court, that it acted without jurisdiction because it denied Brown's PDR two months after denying Brown's writ of habeas corpus.  Pretty much the same argument Brown presented in his motion to dismiss.  *See Exhibits V.*

63.     On March 1, 2021 Mr. Bob Wicoff would move to dismiss Brown's second writ, which the court granted the next day.  On May 19, 2021 the Court of Criminal Appeals withdrew its order of February 16, 1994 and after reconsidering the case on its own motion, decided to dismiss the first writ filed by Brown in 1994.  *See Exhibit O.*

64.     On August 4, 2021 Harris County Assistant Public Defender Carol Camp filed Brown's third writ in the case.  On December 2, 2021 the trial court granted Brown's findings of facts and conclusions of law, *Exhibit W* and on June 16, 2022, the Court of Criminal Appeals granted Brown's writ of habeas corpus.  *See Exhibit X.*

65.     On July 29, 2022, the trial court would grant the District Attorney's Motion to Dismiss, dismissing the criminal action against Brown for the offense of delivery of a controlled substance.  *See Exhibit Y.*

## CAUSES OF ACTION

### COUNT 1:
42 U.S.C. §1983 CLAIMS FOR VIOLATIONS OF THE FOURTH AND FOURTEENTH AMENDMENTS BY ARRESTING PLAINTIFF BROWN WITHOUT PROBABLE CAUSE

66.     Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in the proceeding paragraphs.

29

67. Defendant John Doe arrested Brown without probable cause, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution, in that he did not have a warrant to arrest Brown, nor did he witness a misdemeanor or felony offense in his presence or view that would have given him cause to arrest Brown. None of the HPD officers involved with the drug investigation on November 8, 1990, testified to directly communicating with John Doe providing probable cause, nor was John Doe part of the narcotics team[7] that went out to the J. Thomas Lounge that day. Thus, Defendant John Doe's actions amounted to an illegal arrest and seizure in violation of the 4th and 14th Amendments to the Constitution.

68. More importantly, no one knows who this officer is. *See Exhibits C and U.* Not the undercover officer that day, Defendant DeBlanc; not the surveillance officer, Defendant Winkler; nor did Defendant John King, the prosecutor over the case, know who this person was. *Exhibit C.* John Doe never testified at any proceedings in Brown's criminal case. By not filing a police report, Defendant John Doe completely prevented the defense to question him regarding the facts surrounding the arrest. A denial of due process. Exhibit U.

69. Defendants City of Houston and or Defendant HPD, has a custom, policy, practice, and procedure of falsely arresting individuals and then not disciplining or training officers adequately and the City is therefore liable under 42 U.S.C. Section 1983, 1985 and 1988. There is a pattern and practice of false arrests and condoning of such behavior. John Doe, as a result of customs, Policies, practices, and or lack of training of Defendant City of Houston and HPD, did not write or file a police report giving details of the events that led to the arrest of Plaintiff Brown. This omission denied Brown his right to substantive due process and equal protection of the law.

---

[7] That team was made up of Officer DeBlanc, Winkler, Goode, Lopez and Gonzalez. See Exhibit Z

70.     Defendant Winkler is also liable for false arrest because he, who had no alleged direct contact with Brown—not at the alleged transaction stage, or the arrest stage—wrote the police report in the case, and falsely listed himself as the arresting officer. *Exhibits T and U.* By placing his name as the arresting officer in several offense and or police reports, Winkler has tampered with governmental documents, Defendant Winkler tainted the arrest and everything connected with it. *See Exhibits T and U.*

## COUNT 2:
42 U.S.C. §1983 CLAIM FOR VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS    TO    THE    US    CONSTITUTION    FOR    DENYING CONFRONTATION OF A WITNESS

71.     Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in the proceeding paragraphs

72.     Defendant John Doe's failure to file a police report, along with Defendant Winkler's act of tampering with governmental documents by falsely putting his own name as the arresting officer on the official offense and or police reports, and or omitting said information, denied Brown a fundamental fairness of the trial process as well as the constitutional right of confrontation of a key witness against him. These two defendants effectively denied Brown the ability to confront the arresting officer at the hearing on the motion to suppress and the two trials in his criminal case, which effectively denied Brown the ability to further prove that his arrest was without probable cause as well as prove his innocence.

73.     Defendant City of Houston and or Defendant HPD are liable for denying Brown the right of confrontation, because it is because of customs, Policies, practices, and or lack of training by the city of Houston and the Houston Police Department, that resulted in this situation where the officer who arrested Brown, did not file a report. This situation also denied Brown a fundamental fairness in the proceedings.

## COUNT 3:

### 42 U.S.C. §§ 1983 AND 1985 CLAIMS FOR VIOLATIONS OF THE FOURTH, SIXTH AND FOURTEENTH AMENDMENTS FOR MALICIOUS PROSECUTION AND COSPIRACY TO MALICIOUSLY PROSECUTE

74. Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in the proceeding paragraphs.

75. In addition to fully knowing there was no probable cause for Brown's arrest, the Defendants conspired to maliciously prosecute Brown through the use of perjurious testimony, falsification and or tampering with government records, as well as the fabrication of evidence.

76. Defendant DeBlanc violated Brown's constitutional rights, and engaged in a conspiracy to maliciously prosecute Brown, when he committed perjury in the criminal case, by alleging that Brown entered the lounge with him and assisted him in purchasing $20 of crack cocaine. DeBlanc also violated Brown's constitutional rights by perjuriously alleging that Brown engaged in a paraphernalia transaction outside the lounge.

77. Defendant DeBlanc furthered the conspiracy by manufacturing and or fabricating the testimony surrounding the use of a body microphone in the narcotics investigation, and then by engaging in providing inconsistent testimony regarding said equipment. Specifically, at the hearing on Brown's motion to suppress, and at the first trial, DeBlanc testified that he was wearing a body-mike and that the "raid team" was listening to it. *See Exhibits C and D.* The testimony regarding wearing a body-mike itself, is a fabrication and is not supported by the evidence. *Exhibit U.*

78. At the second trial, Defendant DeBlanc would further the conspiracy to maliciously prosecute, by providing an inconsistent statement compared to the first trial, by alleging that

32

Defendant "Winkler" was monitoring the body-mic that he wore that day of November 8, 1990, as opposed to the "raid team." *See Exhibit F.* This inconsistency would be used by the State's prosecution, Defendant Joe King, to put forth the manufactured and perjurious and fabricated testimony of Defendant Winkler.

79. Defendant Winkler violated Brown's Constitutional rights, and engaged in the conspiracy to maliciously prosecute Brown, in that he tampered with government documents in that he wrote the offense report in the criminal case, and falsely listed himself as the arresting officer, *Exhibit T*, although he did not interact, transact, or come into direct contact with Brown in any capacity. As the team leader of the undercover narcotics team that went out to investigate drug complaints at the J. Thomas Lounge on November 8, 1990, Defendant Winkler—In the furtherance of the conspiracy to maliciously prosecute Brown—would fabricate evidence and engage in perjury, claiming and testifying that Defendant DeBlanc wore a body microphone, and that he was monitoring said device and heard a drug transaction, where Brown participated in said transaction. And Winkler furthered the conspiracy by alleging he heard a second transaction outside the lounge where Defendant DeBlanc gave Brown money to purchase drug paraphernalia, a crack pipe. *Exhibit F.*

80. Defendant Joe King, Harris County District Attorney representing the state in the criminal case, violated Brown's constitutional rights in that he, knowing that there was no probable cause for the arrest of Brown, conspired with other Defendants who manufactured and or fabricated evidence against Brown. Defendant King intentionally and knowingly used said evidence and perjurious testimony to obtain a wrongful conviction of Brown. *Exhibits C, D and F.*

33

81.      Specifically, Defendant King was aware at the motion to suppress hearing that the identity of the arresting officer was not known. *Exhibit C*. This defendant also knew that Defendant Winkler wrote a false police report where he listed himself as the arresting officer, *Exhibit T*, and that said action led to the obscuring of the name of the actual arresting officer in the case. *Id*. Defendant King furthered the conspiracy and the malicious prosecution, in that he knew that Defendant DeBlanc did not utilize a body-microphone that day on November 8, 1990, and therefore knew that the testimony of Defendant Winkler at the second trial was both manufactured and perjured.

82.      Defendant Fred Reynold, the court appointed attorney appointed to represent Brown at the second trial, violated Brown's right to the Fourth, Fifth, Sixth and Fourteenth Amendments to the US Constitution, in that Defendant Reynolds conspired with state officials to maliciously prosecute Brown for delivery of a controlled substance. Defendant Reynolds also denied the effective assistance of counsel guaranteed by the Sixth Amendment, and denied Brown a fundamental fairness of the proceedings in violation of the 14th amendment.

83.      Defendant Reynolds participated in the conspiracy by first helping to suppress exculpatory and mitigating evidence from the jury in the second trial. For instance, Defendant Reynolds never mentioned or questioned the arrest; never pointed out to the jury irregularities surrounding the arrest like no one knowing who the arresting officer was; never expounded on the evidence from the witnesses, that testified that Brown never came in to the lounge; Reynolds never pointed out that Brown was supposed to have been in a transaction outside, but when arrested, had no money on his person; never questioned Winkler as to why his name was on the offense report as the arresting officer, when in fact, he testified to not arresting Brown. *Exhibit F*. Defendant Reynolds furthered the conspiracy by allowing Defendant King and other defendants to introduce

an extraneous offense that had not been adjudicated, and by failing to present the evidence to refute the extraneous offense.

84. Reynolds' participation in the conspiracy also included dismantling Brown's defensive evidence that gained him a mistrial. Both Barbara Williams and Russell Thomas—Brown's codefendants and defense witnesses—testified that Brown never came into the J. Thomas lounge that day with Defendant DeBlanc, and did not assist in the drug transaction. *See Exhibits D and F.* At trial, Defendant Reynolds would refuse to submit the testimony of Williams to the jury when it appeared she would be late to the proceedings, and did not move to re-open when she did appear in court. *Exhibit H.* And when it came to the testimony of Russell Thomas, Defendant Reynolds would discredit and nullify the testimony of this witness, and denigrate Mr. Thomas' character, by calling Mr. Thomas a "parasite" and a "pusher" in the closing argument stage of trial. *Exhibit H.*

85. Finally, Defendant Reynolds would violate Brown's rights by conceding Brown's guilt in the closing argument stage of trial without discussing this with Brown before he did it, or asking Brown for permission to do so. See *Exhibits H.* Defendant Reynolds would do this, even though Brown directly informed Reynolds of his innocence, and directed Reynolds to put forth his innocence by questioning and pointing out the irregularities surrounding the arrest that day. Defendant Reynolds conceded Brown's guilt, even though Brown stated on the record that he never confessed nor admitted guilt. *Exhibit E.* Defendant Reynold called Brown a "dope user," although Brown never admitted to using drugs, and by stating that Brown had committed some crime, by claiming that the "State filed the wrong charges" against Brown, implicating that Brown had committed some crime, when in fact he did not. *See Exhibit. G.*

## COUNT 4:

35

42 U.S.C. §§ 1983 AND 1985 CLAIM FOR VIOLATIONS OF THE FOURTH, FIFTH AND FOURTEENTH AMENDMENTS TO THE US CONSTITUTION, BY ACTING WITHOUT PROBABLE CAUSE AND FAILING TO PROVIDE DUE PROCESS AND EQUAL PROTECTION OF THE LAW WITH RESPECT TO USING ELECTRONIC EASEDROPPING EQUIPMENT, AND OR EQUIPMENT THAT INTERCEPTS ORAL COMMUNICATRION, WITHOUT A WARRANT

86.     Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in the proceeding paragraphs

87.     As an alternative argument to a portion of Count 3, Both Defendants Winkler and DeBlanc violated Brown's right to the Fourth, Fifth and Fourteenth Amendments, by utilizing an electronic ease-dropping equipment, and or electronic equipment that could intercept "oral communication", in that said use was not properly authorized by a warrant based on probable cause, nor was the proper policies and procedures followed in using said equipment to protect Brown's right to equal protection of the law.

88.     Both Winkler and DeBlanc testified they had no warrants that day. See *Exhibit C, Pp. 7, 18 – 19.* Both also testified that the Body-mic equipment could have easily recorded the transaction, but that they did not record it. *Exhibit D, P. 9 - 10.* Had they did so, Brown's right would have been protected, because he would have had the ability to examine and challenge the "oral" evidence in such a situation. These two defendants intentionally and knowingly did not follow General Orders, and other rules, and regulations governing the use of said equipment.  in order to conspire to fabricate the perjurious testimony that was presented at trial.

89.     Defendant Joe King also violated brown's right in this case, and conspired with Winkler and DeBlanc, because he knew that Winkler and DeBlanc did not follow the law, and or General Orders, rules and or regulations that pertains to the use of electronic ease-dropping equipment, and or the "interception of oral communication" equipment.

36

90.     The Defendant City of Houston has violated Brown's right to the Fourth, Fifth and

Fourteenth Amendments, because it has failed to train said defendants of how to use said

equipment, and supervise to make sure that the rules, policies, regulations and laws were being

followed to protect the rights of the criminally accused with the use of electronic ease-dropping

equipment.

## COUNT 5:

42 U.S.C. §§ 1983 CLAIM FOR VIOLATIONS OF THE FIFTH AND
FOURTEENTH AMENDMENTS FOR DUE PROCESS AND EQUAL
PROTECTION OF THE LAW FOR OBSTRUCTING AND OR DENYING
BROWN THE STATE POSTCONVICTION PROCESS FOR OVER 27 YEARS

91.     Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in

the proceeding paragraphs

92.     The Court of Criminal Appeals denied Brown due process and equal protection of

the laws guaranteed by the 5th and 14th Amendment, in that the court, intentionally and knowingly,

and clearly acting without jurisdiction, effectively denied Brown the postconviction process for

over 27 years.   Brown's Petition for Discretionary Review was already pending in the Court of

Criminal before the findings of facts and conclusions of law from the trial court on Brown's first

writ reached the Court, and the CCA chose not to dismiss the writ.

93.     The CCA also received Brown's motion to dismiss that was granted by the trial

court, and still refused to dismiss the writ.   It is clear that the CCA knew that Brown filed his writ

prematurely, and it didn't care.   And this move by the court forced Brown to have to erroneously

meet a higher evidentiary standard—Code of Criminal Procedure 11.07(4)(a)(1) and or (2)—in

order to seek relief from the wrongful conviction.

37

## COUNT 6:

42 U.S.C. §§ 1983 AND 1985 CLAIM FOR VIOLATIONS OF THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE U.S. CONSTITION, IN THAT THE
HOUSTON POLICE DEPARTMENT CONSPIRED WITH THE OFFICE OF
THE ATTORNEY GENERAL OF TEXAS TO OBSTRUCT AND OR DENY
EXCULPATORY EVIDENCE THROUGH THE OPEN RECORDS ACT

94.    Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in
the proceeding paragraphs

95.    Defendant City of Houston, by acts and omissions of its police department, violated
Brown's right to the 5th and 14th Amendment to the constitution because it, in a conspiracy with
the Office of the Attorney General of Texas, Ken Paxton, intentionally, maliciously and knowingly
obstructed the release of exculpatory, valid and legal documents, that Brown properly requested
that pertain to his case. *See Exhibit P.* Both HPD, and the Attorney General's Office knew that
section 552.028 of the Texas Government Code did not prohibit the release of the document that
Brown requested that pertained to him. See Section 552.028(b). By delaying the release of this
material, these defendants prolonged Brown's ability to appeal his case and establish his innocence
through postconviction relief.

96.    After Brown was Released from prison, these two defendants would intentionally,
maliciously and knowingly, misuse section 552.108 to continuously deny Brown the various
documents he sought pertaining to his case. *Exhibits Q and R.* These defendants, in 2019, denied
Brown documents in his case under section 552.108 because the charges against Thomas Ervin
had been dismissed, even though Thomas Ervin had not sought to make said documents private,
nor object in any direct or indirect way to Brown obtaining said documents. Thomas Ervin had
also been deceased seven years prior to said request and decision, on or about January 12, 2012.
*See Exhibit S.* Equal protection is also violated here because the public would not have been denied

38

any of the information requested. More importantly, Mr. Ervin was deceased and clearly could

not have been prejudiced by the release of said documents. *Exhibits S.*

## COUNT 7:
42 U.S.C. §§ 1983 CLAIM FOR VIOLATION OF THE FIFTH AND
FOURTEENTH AMENDMENTS TO THE U.S. CONSTITION, IN THAT
SECTIONS 552.028 AND 552.108 OF THE TEXAS GOVERNTMENT CODE IS
UNCONSTITUTIONAL AND DENIES EQUAL PROTECTION OF THE LAWS
BECAUSE IT ALLOWS THE HOUSTON POLICE DEPARTMENT AND
OTHER GOVERNMENTAL BODIES OR ORGANIZATONS TO TARGET AND
DENY    EXCULPATORY    INFORMATION    TO    INDIGENT,    THOSE
INCARCERATED, THEIR FAMILY MEMBERS, AND TO THOSE RELEASED
FROM PRISON

97.     Plaintiff, Tracy Brown, hereby incorporates by reference those allegations made in

the proceeding paragraphs

98.     As an alternative to Count 6 below, Brown argues that section 552.028 denies equal

protection of the laws, as well as due process, because it targets and discriminates against the

indigent incarcerated person. Brown specifically requested documents that pertained to him and

the statute allowed for HPD and the Attorney General to deny Brown said records. *See Exhibits*

*Q and R.* Brown's mother, Vivian Brown, and his cousin, Mrs. Kim Martinez, requested said

documents, and were automatically classified as agents of Brown and denied said Documents. *Id.*

99.     Neither family member was incarcerated, and never stated that they were obtaining

said documents for Plaintiff Brown. The statue is unconstitutional because it provides no

safeguards that would prevent the party from whom the documents were being sought, from

arbitrarily classifying individuals as agents and simply deny all who ask, under said excuse. Plus,

by requiring that the only person eligible to receive said documents has to be an attorney, a paid

agent, discriminates toward the indigent individual who cannot financially afford to hire an

attorney like plaintiff Brown. The attorney, if hired, would work "for" the incarcerated individual.

Why does an innocent incarcerated person need to hire a middle man? This law requires an

incarcerated person to spend thousands of dollars to hire someone to secure documents that would cost a fraction of the attorney fees, but also before securing the necessary evidence to determine if there is a case to be made with said evidence, which would necessitate the need for an attorney.

100.    Finally, section 552.108 is unconstitutional because it literally allows defendant Houston Police Department to suppress or obstruct evidence to Brown, because "it", the Houston Police Department, erroneously arrested a codefendant at the same time Brown was arrested on November 8, 1990. Put another way, because Houston Police arrested Thomas Ervin without probable cause and had to dismiss the charges against him, they were able to use that same error to prohibit Brown from investigating the specifics surrounding his arrest. A denial of equal protection and due process of law.

## DAMAGES

101.    As a result of Defendants' conduct, Mr. Brown sustained damages far exceeding the minimum jurisdictional limits of this court.

## JURY DEMAND

102.    Plaintiff hereby demands a jury trial of all issues so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court enter judgment against each Defendant and grant:

a.    Compensatory and consequential damages to Plaintiff as compensation for all injuries and losses Plaintiff suffered which were caused by the willful and/or deliberately indifferent acts of Defendants, in an amount to be determined at trial;

40

b.       Punitive damages on all claims and against such Defendants as allowed by law, in

an amount to be determined at trial;

c.       Costs associated with this action, including reasonable attorneys' fees under 42

U.S.C. §1988;

d.       Prejudgment and post-judgment interest as allowed by law; and

e.       Any further relief that this Court deems just and proper, and any other appropriate

relief available at law and equity.

Date July 8, 2024

                                                        Respectfully Submitted,

                                                        Tracy Brian Brown
                                                        Plaintiff, Pro Se
                                                        3814 Pebble Garden Lane
                                                        Katy, Texas 77449


I, Tracy Brian Brown, do hereby declare under penalty of perjury, that the foregoing is true

and correct. I further declare that Exhibits A through Z attached to this complaint are certified and

or true and correct copies of official documents in this case.

                                                        Tracy Brian Brown

41